J-S73043-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| CORDERO Z. URRITIA, | : | |
| | : | |
| Appellant | : | No. 850 MDA 2014 |

Appeal from the Judgment of Sentence entered on December 19, 2013
in the Court of Common Pleas of Dauphin County,
Criminal Division, No. CP-22-CR-0004521-2012

BEFORE: BOWES, WECHT and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED JANUARY 07, 2015**

Cordero Z. Urritia ("Urritia") appeals from the judgment of sentence entered following his conviction of aggravated assault, persons not to possess a firearm, discharge of a firearm into an occupied structure, recklessly endangering another person and criminal mischief.[1] We affirm.

In its October 10, 2014 Opinion, the trial court set forth the procedural and factual history underlying the instant appeal, which we incorporate herein by reference.[2] **See** Trial Court Opinion, 10/10/14, at 1-10.

Urritia presents the following claims for our review:

---

[1] 18 Pa.C.S.A. §§ 2702, 6105, 2707.1, 2705, 3304.

[2] In brief, the above-described charges arose out of Urritia's discharge of a firearm into a van and house, following an earlier altercation with one of the home's occupants. Trial Court Opinion, 10/10/14, at 4.

    I.    Whether the Commonwealth failed to present sufficient
    evidence to sustain [Urritia's] convictions for aggravated assault,
    reckless endangerment and discharging a firearm into an
    occupied structure where it failed to prove that [Urritia]
    possessed the requisite *mens rea* for each offense?

    II.    Whether the trial court erred in denying [Urritia's] Post-
    Sentence Motion where the jury's verdict of guilty on all counts
    was contrary to the weight of the evidence so as to shock one's
    sense of justice where there was conflicting testimony regarding
    whether [Urritia] was the individual who committed the crimes
    charged?

    III.    Whether the trial court abused its discretion in denying
    [Urritia's] Motion for Modification of Sentence where [Urritia's]
    sentence of twenty (20) to forty (40) years' incarceration is
    excessive and unreasonable where the trial court did not
    consider [Urritia's] age, the victim's actions and that the charges
    resulted from a single act?

Brief for Appellant at 8.

Urritia first claims that the evidence is insufficient to sustain his

convictions of aggravated assault, reckless endangerment and discharging a

firearm into an occupied structure. *Id.* at 18. As to each offense, Urritia

claims that the Commonwealth failed to prove the requisite *mens rea*. *Id.*

Regarding his conviction of aggravated assault, Urritia argues that the

Commonwealth failed to prove that he possessed the specific intent to cause

serious bodily injury, where Urritia shot into the brick walls of the home, and

not through any window. *Id.* at 19. Regarding his conviction of recklessly

endangering another person, Urritia argues that the Commonwealth failed to

prove that he had acted recklessly, "or that his conduct placed the victim in

danger of death or serious bodily injury." *Id.* at 20. Regarding his

conviction of discharging a firearm into an occupied structure, Urritia claims that the Commonwealth failed to prove intent where he "only shot into the brick on the outside of the house, which stopped the bullets before they were able to enter the house." *Id.* at 20-21.

In reviewing a challenge to the sufficiency of the evidence, we evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Commonwealth v. Bibbs*, 970 A.2d 440, 445 (Pa. Super. 2009) (citation omitted).

> Evidence will be deemed sufficient to support the verdict when it established each element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty, and may sustain its burden by means of wholly circumstantial evidence. Significantly, [we] may not substitute [our] judgment for that of the factfinder; if the record contains support for the convictions they may not be disturbed.

*Id.* (citation and quotation marks omitted). "Any doubt about the defendant's guilt is to be resolved by the factfinder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Scott*, 967 A.2d 995, 998 (Pa. Super. 2009).

In its October 10, 2014 Opinion, the trial court addressed Urritia's challenges to the sufficiency of the evidence and concluded that they lack merit. *See* Trial Court Opinion, 10/10/14, at 2-10 (summarizing the evidence presented at trial), 11-13 (addressing the legal sufficiency of the

evidence underlying the relevant convictions). The trial court's findings are supported by the evidence of record, and its legal conclusions are sound. *See id.* Accordingly, we affirm based upon the trial court's Opinion with regard to Urritia's sufficient challenges. *See id.*

Urritia next claims that the jury's verdicts are against the weight of the evidence. Brief for Appellant at 21. In support, Urritia argues that the Commonwealth failed to prove that he was the individual who had engaged in the shooting. *Id.* at 22-23. Urritia points out evidence that Dannielle Hartman ("Hartman") identified the individuals involved in the shooting as brothers William Russaw ("William") and Rommell Russaw. *Id.* at 23. Further, Urritia directs our attention to the testimony of Police Officer Allison Shuff ("Officer Shuff"), who encountered William at his house following the shooting, and stated that he matched the description of one of the two males who were in the area carrying guns. *Id.*

According to Urritia, the shooting occurred at 2:42 p.m. *Id.* Urritia asserts that he returned home before 2:00 p.m., and never left his home that evening. *Id.* Urritia also states that the testimony of William is unreliable, as he had prior convictions for crimes involving dishonesty. *Id.* at 23-24.

A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. ***Commonwealth v. Cousar***, 928 A.2d 1025, 1035-36 (Pa. 2007).

> An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.

*Id.* at 1036 (citation omitted).

In its Opinion, the trial court addressed Urritia's challenge to the verdicts as against the weight of the evidence, and concluded that they lack merit. *See* Trial Court Opinion, 10/10/14, at 14-15. Upon review of the trial court's Opinion and the certified record, we discern no abuse of discretion by the trial court in rejecting this claim. Accordingly, we affirm on the basis of the trial court's Opinion with regard to this issue. *See id.*

In his final claim, Urritia challenges the discretionary aspects of his sentence, for which there is no automatic right to appeal.

> Rather, to reach the merits of a discretionary sentencing issue, we must determine: (1) whether the appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *See* Pa.R.Crim.P. 720; (3) whether the appellant's brief has a fatal defect, *See* Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is inappropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

***Commonwealth v. Williams***, 787 A.2d 1085, 1087-88 (Pa. Super. 2001).

Here, Urritia timely filed his Notice of Appeal, properly preserved his claim in in his Post Sentence Motion and included in his brief a Statement of Reasons relied upon for allowance of appeal, pursuant to Pa.R.A.P. 2119(f). Accordingly, we next determine whether Urritia's claim presents a substantial question that his sentence is inappropriate under the Sentencing Code.

A substantial question requires a showing that "the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process." ***Commonwealth v. Mouzon***, 812 A.2d 617, 627 (Pa. 2002). Our inquiry must focus upon the reasons for which the appeal is sought, in contrast to the facts underlying the appeal, which are necessary only to decide the appeal on the merits. ***Id.***

In his Statement of Reasons, Urritia argues that his sentence of 20-40 years in prison is excessive and unreasonable. Brief for Appellant at 16. Urritia states that he was only 24 years old at the time of the incident. ***Id.*** at 17. Urritia directs our attention to testimony of his aunt, who stated that Urritia had expressed the desire "to turn his life around." ***Id.*** Urritia further asserts that the trial court failed to consider that the victim had provoked Urritia by punching him immediately before the shooting. ***Id.*** Finally, Urritia

claims that the trial court improperly imposed consecutive sentences, where his actions arose during a single incident. *Id.*

This Court has held that a sentencing court's failure to consider mitigating factors, which then results in an excessive sentence, raises a substantial question.[3] *See Commonwealth v. Felmlee*, 828 A.2d 1105, 1107 (Pa. Super. 2003).

Urritia claims that his sentence of 20-40 years in prison is excessive, as he was in his early twenties at the time of sentencing.[4] Brief for Appellant at 26. Urritia points out, as mitigating evidence, the fact that the victim had punched Urritia immediately before the shooting, and that Urritia waited until the victim was inside of the house before he fired his weapon. *Id.* Urritia offers, as mitigating evidence, the fact that he did not shoot out any of the home's windows, and that the bullets only entered the brick façade. *Id.* Finally, Urritia asserts, as a mitigating factor, the fact that the charges arose out of a single incident. *Id.*

---

[3] We address only this aspect of Urritia's challenge to the imposition of consecutive sentences. A sentencing court generally has discretion to impose multiple sentences concurrently or consecutively, and a challenge to the exercise of that discretion does not ordinarily raise a substantial question. *Commonwealth v. Pass*, 914 A.2d 442, 446-47 (Pa. Super. 2006); *see also Commonwealth v. Hoag*, 665 A.2d 1212, 1214 (Pa. Super. 1995) (stating that an appellant is not entitled to a "volume discount" for his crimes by having his sentences run concurrently).

[4] In his Pa.R.A.P. 2119(f) Statement, Urritia states that he was 24 years old at the time of sentencing. Brief for Appellant at 17. In the Argument section of his brief, Urritia states that he was 20 years old at the time of sentencing. *Id.* at 26. This discrepancy makes no difference to our resolution of Urritia's claims.

In its Opinion, the trial court addressed this claim and rejected it as without merit.[5]  Trial Court Opinion, 10/10/14, at 17-19.  We agree with the sound reasoning of the trial court, and discern no error or abuse of discretion in this regard.  Accordingly we affirm on the basis of the trial court's Opinion with regard to this claim. ***See id.***

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/7/2015

---

[5] Of particular note, the trial court observed that Urritia is a "second strike" offender based upon his prior conviction for a crime of violence, ***see*** Trial Court Opinion, 10/10/14, at 18 (citing 18 Pa.C.S.A. §§ 1103(1)-(3), 1104(2) and 1105).  In its Opinion, the trial court indicated that it had considered the evidence presented at the sentencing hearing, and had the benefit of a pre-sentence investigation report.  Trial Court Opinion, 10/10/14, at 18. ***See Commonwealth v. Griffin***, 65 A.3d 932, 937 (Pa. Super. 2013) (concluding that where a sentencing court has the benefit of a pre-sentence investigation report, the appellate court may assume that the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors).

ORIGINAL

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA
:
v. : NO.: 4521 CR 2012
: (850 MDA 2014)
:
CORDERO Z. URRITIA : CHARGES: AGG. ASSAULT, ET AL

## MEMORANDUM OPINION

Defendant, Cordero Z. Urritia ("Appellant" or "Urritia") is appealing this Court's judgment of sentence imposed on December 19, 2013. This opinion is written pursuant to Pa.R.A.P. 1925(a).

## PROCEDURAL HISTORY

Appellant, Cordero Urritia was arrested in connection with a shooting that took place on July 23, 2012, in the 2000 block of Logan Street in Harrisburg, Pennsylvania. Appellant was charged with and convicted of the following crimes: aggravated assault,[1] person not to possess a firearm,[2] discharge of a firearm into an occupied structure,[3] recklessly endangering another person,[4] and criminal mischief.[5] Based on the convictions, Appellant was sentenced on December 19, 2013 to an aggregate term of incarceration of eighteen and one-half (18 ½) to thirty- seven (37) years in a state correctional institution along with $2125 in fines, payment of the costs of prosecution and $1 restitution. Appellant filed a timely post-sentence motion on December 23, 2013

---

[1] 18 Pa.C.S. § 2702(a)(1).
[2] 18 Pa.C.S. § 6105(a)(1).
[3] 18 Pa.C.S. § 2707.1(a).
[4] 18 Pa.C.S. § 2705.
[5] 18 Pa.C.S. § 3304(a)(5).

4-20

which this Court denied on April 16, 2014. Subsequently, on May 15, 2014, the

Appellant timely filed the instant appeal to the Pennsylvania Superior Court.

In compliance with this Court's May 21, 2014 order, Appellant filed a Statement

of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b) and raises the

following issues for review:

1. The Commonwealth failed to present sufficient evidence to sustain Appellant's convictions for aggravated assault, reckless endangerment, criminal mischief, and discharging a firearm into an occupied structure where it failed to prove that Appellant possessed the requisite *mens rea* for each offense.

2. The trial court erred in denying Appellant's Post-Sentence Motion where the jury's verdict of guilty on all counts was contrary to the weight of the evidence so as to shock's one's sense of justice where there was conflicting testimony regarding whether Appellant was the individual who committed the crimes committed.

3. The trial court committed reversible error in denying Appellant's motion for a mistrial where a prosecution witness stated, in the presence of the jury, that Appellant was incarcerated.

4. The trial court abused its discretion in denying Appellant's Motion for Modification of Sentence where Appellant's sentence of twenty (20) to forty (40) years' incarceration is excessive and unreasonable where the trial court did not consider Appellant's age, the victim's actions, and that the charges resulted from a single act.

## FACTUAL BACKGROUND

A jury trial held on October 21-23, 2013, established the following facts:  On July

23, 2012, Officer Allison Shuff ("Officer Shuff"), a patrol officer with the Harrisburg

2

Bureau of Police ("HBP"), responded to a radio call around 3:30 p.m. that shots had been fired in the 2000 block of Logan Street. (Notes of Testimony, Trial, at 37-40).[6] Officer Shuff stated that it took her less than a minute to respond to the call as she was located at 3rd and Muench Streets, 3-4 blocks away. (N.T. at 40). Officer Shuff was the first officer on the scene which she described as a residential block in a high crime area of the Midtown section of Harrisburg City. (N.T. at 40-42).

When Officer Shuff arrived on the crime scene, she observed the victim of the shooting, later identified as William Russaw ("Mr. Russaw"), standing next to a damaged van parked on the east side of the street in front of a residence at 2011 Logan Street. (N.T. at 43-45). Officer Shuff saw bullet holes in the body of the van as well as a broken window and bullet strikes on the outside of the van. (N.T. at 43). She also observed 6 bullet casings on the west side Logan Street. (N.T. at 45). Mr. Russaw was shirtless and appeared quiet due to shock. (N.T at 46). Other members of Mr. Russaw's family were inside the house and she saw no one else in the area.

Officer Shuff had heard a radio call thirty minutes prior to the shooting to the effect that two black men were chasing each other and shooting, one of which matched Mr. Russaw's description. (N.T. at 49-50). For that reason, she performed a pat-down frisk of Mr. Russaw to determine whether he was armed, which he was not. (N.T. at 49-51). Officer Shuff proceeded to obtain information from Mr. Russaw, called for back up and secured the crime scene until the forensic investigators arrived. (N.T. at 47-48; 52). She also spoke with the owner of the van, a woman named Ethel Harris, who indicated that she had not witnessed any of the events. (N.T. at 54-55).

---

[6] Hereinafter, "N.T."

Mr. Russaw testified at trial to his version of events. He stated that, on the date of the shooting, he'd had an earlier encounter with Appellant near a park in the area of Muench and Logan Streets which had turned into a physical altercation. (N.T. at 63-67). Russaw stated that he had been speaking to a woman on the street in the hopes of "picking her up" when Appellant suddenly came up from behind with another man and began "ranting and raving" about the woman being "his girl." (N.T. at 63-64). Mr. Russaw said that he tried to apologize, but a fistfight started nonetheless. (N.T. at 69; 74-75; 80). He identified Appellant as the person who attacked him. (Id.) The altercation was broken up by the other man who arrived with Appellant and the woman on the street. (N.T. at 69).

Mr. Russaw said that following the fight, he returned to his house where his mother, father, brother and children were living, at 2011 Logan Street. (N.T. at 69). While he was standing in front of the Logan Street house telling his brother Rommell Russaw about the fight, he saw Appellant walking up Logan Street next to a slow moving vehicle. (N.T. at 69-70; 81-82). Mr. Russaw testified that he saw Appellant move a gun from his back pocket to his front pocket which caused him to yell to his brother "he got a gun" and the two ran into the house.(N.T. at 69-70; 82-84). He said that Appellant began shooting at the house for a total of 6 or 7 shots. (N.T. at 70).

Once the shooting stopped, Mr. Russaw got his father's gun which was located in the house and went outside looking for Appellant; but, he was gone. (N.T at 71-74). He believes his father called 911 and when the police arrived he gave his story. (N.T. at 74).

4

Officer Marc McNaughton ("Officer McNaughton") is a forensic investigator for the HBP who was assigned to Logan Street shooting. (N.T. at 92-93). When he arrived, the crime scene had already been secured, so he began marking evidence and taking photographs. Officer McNaughton gathered six shell casings including some that were strewn in the alley next to the residence. (N.T. at 94-97). After following the path of a bullet hole through the outside of the van, Officer McNaughton was able to find a projectile in the alley, too. (N.T. at 92-93). He also found two projectile fragments next to the van. (N.T. at 97). Officer McNaughton marked and photographed the broken window in the van, a bullet hole in the door and a bullet strike to a table in the van. (N.T. at 99). Additionally, he marked and photographed several bullet strikes to the house including near the address sign, window frame and on the brick front. (N.T. at 103-105).

Officer McNaughton testified that, based on his police training and firearms experience, the shell casing were brass 9mm casings. (N.T. at 107). The casings and projectiles were sent to the Pennsylvania State Police ("PSP") lab for testing.

Corporal Nicholas Scianna ("Cpl. Scianna"), a tool mark and firearms examiner with the PSP crime lab, examined the casings and projectiles submitted by Officer McNaughton. (N.T. at 117; 127). After a visual and microscopic examination, Cpl. Scianna determined that the shell casings had a WCC #11 NATO head stamp which told him that all seven were Winchester 9mm NATO shell casings. (N.T. at 128-129). Upon completion of his analysis, Cpl. Scianna concluded within a reasonable degree of scientific certainty that all seven casings had been fired from the same unknown firearm. (N.T. at 130; 132-133). He also conducted a similar examination of the projectile fragments the HBP had submitted for analysis. (N.T. at 134-138). He

5

determined that one fragment was a mutilated metal bullet jacket fragment and one was a lead core fragment. (N.T. at 135). Cpl. Scianna again concluded within a reasonable degree of scientific certainty that the projectiles had been fired from the same unknown firearm. (N.T. at 137). However, based upon his analysis, he was unable to opine that the projectiles and casings came from the same unknown firearm. (N.T. at 138).

At the time of the incident, Bobby Middleton ("Mr. Middleton") was involved in a romantic relationship with Denise Thompson, Appellant's mother, which had lasted seven years. The pair lived in a home at Third and Muench Streets in Harrisburg. (N.T. at 146-147). After Appellant was arrested, Mr. Middleton gave a statement to Detective Jason Paul ("Det. Paul") of the HBP on July 25, 2012, which was memorialized in writing. (N.T. at 153). However, the testimony provided at trial differed from the earlier written statement he had provided to police. Further, due to the fact that he met with police, his relationship with Denise Thompson ended and she demanded that he move out of the house. (N.T. at 176).

Mr. Middleton's reluctance to testify in a cooperative manner resulted in this Court's granting the Commonwealth's request to question him as on cross examination. (N.T. at 156). Mr. Middleton testified that Appellant regularly left and returned to the house day and night. (N.T. 151; 159-161). On the day of the incident, Middleton was at home. He stated that, in the afternoon when the shooting occurred, Appellant came into the house, went up the stairs, and came back down carrying his shirt and a bag and left again. (N.T. at 158-159). Middleton did not find his behavior unusual but he and Denise told him that they didn't want any trouble in the house. (N.T at 160). Mr. Middleton

6

testified that shortly thereafter, Appellant returned to the house and did not leave that evening or the next day. (N.T. at 15-162).

After speaking with police, Mr. Middleton began having encounters with people driving by pointing their hands at him in the shape of a gun. (N.T. 174). The night before he testified at trial, Mr. Middleton was jumped and beaten on the street by four males. He stated that Appellant had not threatened him but, acknowledged that the assault might have been related to the case. (N.T. 189).

With respect to the statement given to Detective Paul, Mr. Middleton claimed that most of the facts were false and that he had not known what he was signing. (N.T. at 165-168). He also claimed that he was brought to the police station under the false pretense of him being wanted on an outstanding warrant when none actually existed. (N.T. at 187).

Detective Paul testified regarding his encounter with Mr. Middleton as well as the specifics of the statement he took from him. On the morning of July 25, 2012, Det. Paul executed a search warrant for Appellant. While in custody, he stated that Middleton could vouch for him being at home on the day of the incident. (N.T. at 193-194). Det. Paul and Det. Neal went back to the home to speak with Mr. Middleton. (N.T. at 193). He testified that his level of cooperation varied as he would stop talking if Ms. Thompson entered the room. (N.T. at 193-194). Therefore, while speaking out of Ms. Thompson's hearing, the three men agreed to say that the police discovered an outstanding warrant for Middleton which necessitated a trip to the police station. The purpose of the story was to enable Middleton to leave and provide a full story without

7

Ms. Thompson's intrusion and influence. (N.T. at 194). It became unnecessary for Middleton to use the excuse to leave as Ms. Thompson demanded that he leave the house and return his house key. (N.T. at 194).

When Detective Paul interviewed Middleton at the police station, he was very cooperative and acknowledged that he fully understood the purpose of the interview and that the detective would be typing the responses he gave to the questions. (N.T. at 195). Det. Paul testified that Mr. Middleton clearly understood what was going on and he fully cooperated. (N.T. at 195). Mr. Middleton had the opportunity to read the entire report prior to initialing and signing it indicating that it was accurate and free of errors. (N.T. at 195-197).

In his statement, Mr. Middleton explained that after he and another person had picked up Appellant from the parole office at 12:45 p.m. on July 23, 2012, they returned to the house on Third and Muench Streets around 1:15 p.m. Appellant later left the house about 1:15, but returned within about 20 minutes. (N.T at 199-200). Upon his return, Appellant's shirt was off and it appeared to Middleton that he had been "involved in something." (N.T. at 200). When Mr. Middleton asked what was wrong, Appellant said to him "...it wasn't nothing [sic] that he couldn't handle." (Id.) Mr. Middleton told Det. Paul that Appellant came down from his room carrying a white bag under his shirt. Middleton wasn't sure what was in the bag but he saw Appellant put a clip of ammunition in his pocket; he explained "that's how I knew it was a gun." (Id.) Appellant later returned to the house and while smoking on the porch, Mr. Middleton saw him give the same bag to someone in a van. (N.T. at 201). Appellant had instructed Mr.

8

Middleton not to open the door for anyone and he proceeded to stay in the house that night and the next day. (Id.)

Appellant presented the testimony of Danielle Hartman ("Ms. Hartman"). On the date of the incident, around 2:00 p.m., Ms. Hartman had taken her 3 and 4 year old cousins to a park known in the neighborhood as Dauphin Park located around Fourth and Dauphin Streets about one block east of Logan Street. (N.T. at 216-219). She had walked to the park from her house on Jefferson Street by way of Logan Street which she referred to as an alley. (N.T. at 219). While at the playground, Ms. Hartman saw two men arrive to the basketball court in a gray car. (N.T. at 221). She stated that another man, which she described as older and looking a little crazy, suddenly came out from a location close to the nearby Pennsylvania National Fire Museum. (Id.) Ms. Hartman testified that the man began arguing with one of the individuals who had arrived at the park earlier. (N.T. at 221-223). While the two were arguing, another male at the park told Ms. Hartman that she should take the young children and leave the area. (N.T. at 222). The individuals involved in the argument included Appellant. (N.T. at 225).

The four men split up, two left the area and Ms. Hartman took the children back up Logan Street to get away from whatever conflict had begun. (N.T. at 222, 224). While walking in the alley, Ms. Hartman looked back and saw the older man walking back toward the area of the park with another male who both had guns, one wearing a white T-shirt and one wearing a white tank top that he took off. (N.T. at 225, 228). After the two men turned a corner out of Ms. Hartman's sight, she called 911 to report two black men carrying guns. (N.T. at 230). When she ended the call to 911, she heard

9

gunshots fired so she ran home. (N.T. at 230-232). However, according to the transcript of Ms. Hartman's 911 call, it had been placed at 2:49 p.m. on the date of the incident, and the other 911 calls reporting shots fired in the vicinity did not come in until approximately 35 minutes later. (N.T. at 246-250). Ethel Harris' call about shots fired at her van was placed at 3:15 p.m. (Id.) From photographs she was shown prior to and during the trial, Ms. Hartman identified the men in the alley as William Russaw and his brother Rommell Russaw despite not previously being able to identify them for Det. Paul much closer to the date of the incident. (N.T. at 233-235; 243-246).

## DISCUSSION

### SUFFICIENCY OF THE EVIDENCE

The Superior Court has stated that the standard of review when an appellant is challenging the sufficiency of the evidence is well established:

> "...whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

******

10

This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." Commonwealth v. Antidormi, 2014 PA Super 10, 84 A.3d 736, 756 (Pa. Super. 2014)(internal citations and quotation marks omitted).

Appellant contends that the evidence presented at trial is insufficient to prove the mens rea element of each crime for which he was convicted except unlawful possession of a firearm.

At Count 1, Appellant was convicted of aggravated assault. With respect to the charge of aggravated assault, "the intent to commit aggravated assault is established when the accused intentionally acts in a manner which constitutes a substantial or significant step toward perpetrating serious bodily injury upon another." Com. v. Rosado, 454 Pa. Super. 17, 25-26, 684 A.2d 605, 609-10 (1996) (internal citations omitted). Additionally, the Superior Court has "found the requisite intent to commit aggravated assault when the accused has fired a gun into a building he knew was occupied" or into a structure in which people live. Id. citing Commonwealth v. Eaddy, 419 Pa.Super. 48, 614 A.2d 1203 (1992), appeal denied, 534 Pa. 636, 626 A.2d 1155 (1993); Commonwealth v. Hunter, 434 Pa.Super. 583, 586, 644 A.2d 763, 764 (1994), appeal denied, 542 Pa. 661, 668 A.2d 1125 (1995). "Because the possibility exists that a person in the home could be harmed if someone were to shoot into the home, an attempt to cause serious bodily harm to such a person can be inferred." Id. Bearing in mind these legal principles, this Court believes that an analysis of Appellant's sufficiency claim regarding Count 3 – Reckless Discharge of a Firearm Into an

11

Occupied Structure will also dispose of Appellant's sufficiency claim in connection with the aggravated assault conviction.

According to the statute, a person commits an offense if he knowingly, intentionally or recklessly discharges a firearm from any location into an occupied structure which is defined as "[a]ny structure, vehicle or place adapted for overnight accommodation of persons or for carrying on business therein, whether or not a person is actually present." 18 Pa.C.S.A. § 2707.1. A review of the evidence of record read in light of the unambiguous language of the statute, this Court finds that sufficient evidence was presented to support the jury's verdict on this charge.

Mr. Russaw's eyewitness testimony placed a gun in Appellant's hand as he was approaching the Logan Street residence where Mr. Russaw and several other family members lived and were present at the time of the incident. Mr. Russaw and his brother ran into the house after observing Appellant holding a gun and immediately heard multiple gunshots hitting the house and attached structures. Mr. Russaw's personal observations, along with his conduct when he and his brother ran into the house once they had seen the gun in Appellant's hand, clearly describe an intent to discharge his firearm into the Logan Street residence.

This same evidence of record supports the jury's verdict on the aggravated assault charge. As stated above, the Superior Court found in Eaddy and Hunter, *supra*. Appellant act of shooting into the Logan Street residence satisfies the intent element of intent the crime of aggravated assault in light of the fact that Mr. Russaw stated he saw Appellant walking towards him while he was on the porch. Based on that testimony, a

12

jury may infer that Appellant saw Mr. Russaw run back into the house thereby proving that he knew he was firing into an occupied structure. This evidence should be considered in conjunction with Mr. Middleton's account of the events of the day. Mr. Middleton's testimony included his observation of Appellant leaving the house at a time that comports with several witnesses' timelines with a gun and clip of ammunition. This happened after Mr. Middleton questioned Appellant about his aggravated demeanor which elicited the response of "...it wasn't nothing [sic] that he couldn't handle." (N.T. at 200). Therefore, this Court finds that sufficient evidence of record was presented at trial to support the jury's verdict of guilt on the aggravated assault charge.

The Appellant was also convicted of recklessly endangering another person. The *mens rea* for the crime of recklessly endangering another person is a "conscious disregard of a known risk of death or great bodily injury to another person." Commonwealth v. Fabian, 2013 PA Super 6, 60 A.3d 146, 155 (Pa. Super. Ct. 2013) appeal denied, 620 Pa. 719, 69 A.3d 600 (2013) *citing and quoting* Commonwealth v. Klein, 795 A.2d 424, 428 (Pa.Super. 2002). Again, the evidence discussed above is more than sufficient to prove that Appellant consciously disregarded a known risk of death or bodily injury as he shot at Mr. Russaw and into an occupied residence.

Appellant makes the same argument with respect to his conviction for criminal mischief. As charged in this case, a person is guilty of criminal mischief if he "intentionally damages real or personal property of another." 18 Pa.C.S.A. § 3304. Viewing the evidence in light of the Commonwealth as the verdict winner, Mr. Russaw presented clear testimony that as he turned to run into his family's house when he saw Appellant draw a gun, he heard gunshot strike his family's residence. Additionally,

13

Officer McNaughton testified to observing multiple bullet strikes to the house including one near a window frame. Without referencing any other evidence of record, the intent element of criminal mischief was without a doubt established by sufficient evidence.

Next, Appellant challenges the jury's verdict contending that it was against the weight of the evidence to such an extent so as to shock one's sense of justice. Our Supreme Court has stated:

> A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The fact finder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.

Commonwealth v. Weathers, 2014 PA Super 138, 95 A.3d 908, 910-911 (Pa. Super. 2014) citing Commonwealth v. Diggs, 597 Pa. 28, 949 A.2d 873, 879–80 (Pa.2008) (internal citations omitted). When a defendant motions for a new trial based on a weight of the evidence claim, he concedes that sufficient evidence exists to sustain the jury's verdict. Commonwealth v. Rosetti, 863 A.2d 1185, 1191-1192 (Pa. Super. 2004).

Appellant specifically contends that the verdict was against the weight of the evidence due to the presentation of conflicting testimony regarding the identity of the shooter. As stated above, the evidence presented at trial was clearly sufficient to support the jury's verdicts that Appellant was the person who committed the charged crimes. As pointed out by the Court when charging the jury, the attorney's generally

14

agreed that the charges were not necessarily in dispute but rather, the issue on trial was "whether or not [Appellant] is the person who committed those crimes." (N.T. at 277). Regarding any inconsistencies in statements and testimony or any credibility questions with respect to a particular witness, resolution of such issues rests with the jury and it is abundantly clear that the jury determined that Appellant was that person. Upon review of the record, this Court finds that the jury's determination on this charge does not shock one's sense of justice to such an extent that it would warrant reversal.

MISTRIAL

The decision whether to declare a mistrial is within the sound discretion of the trial judge and will not be reversed absent a flagrant abuse of that discretion. Commonwealth v. Hamm, 325 Pa.Super. 401, 412, 473 A.2d 128, 133 (1984); Commonwealth v. Seigrist, 253 Pa.Super. 411, 418, 385 A.2d 405, 408 (1978).

> It has long been held that evidence of a distinct crime, except under special circumstances, is inadmissible against a defendant who is being tried for another crime, because the commission of one crime is not proof of the commission of another, and the effect of such evidence is to create prejudice against the defendant in the jury's mind. However, our Supreme Court made clear in however, that (not) all references which may indicate prior criminal activity warrant reversal. Mere "passing references" to prior criminal activity will not necessarily require reversal unless the record illustrates that prejudice resulted from the reference. Moreover, prejudicial effect may be overcome by cautionary instructions or an appellate court may find that any error was harmless. Commonwealth v. Thomas, 361 Pa. Super. 1, 14-15, 521 A.2d 442, 449-50 (1987)(internal citations, footnotes and quotation marks omitted).

In the instant matter, while the Commonwealth was questioning Mr. Middleton on direct examination regarding whether he was in fear of Appellant the following exchange took place:

15

Mr. Baer:    Q.    You are afraid of this defendant?

Mr. Middleton:    A.    No, I'm not afraid of him. No, he didn't make no threats towards me. He been out there incarcerated like I was. He the one told me I'm coming to jail. I knew that too already. It don't make a difference. (N.T. at 179-180).

Following the completion of direct examination, the jury was excused for lunch as defense counsel requested that cross-examination commence after the break. (N.T. at 181). At such time, defense counsel made a motion for mistrial as Mr. Middleton mentioned Appellant's incarceration during questioning. (N.T. at 182). The Commonwealth argued that Mr. Middleton's statement was a passing, incidental reference to Appellant that caused no harm with respect to the case. (Id.) This Court denied Appellant's motion for mistrial. (Id.)

When the Commonwealth introduces evidence which does not directly establish appellant's prior criminal conduct, but which is merely suggestive of it, "... the operative question is whether the jury 'could reasonably infer from the facts presented that the accused had engaged in prior criminal activity.' " Commonwealth v. DeCampli, 243 Pa.Super. 69, 76, 364 A.2d 454, 457 (1976), citing Commonwealth v. Groce, 452 Pa. 15, 20–21, 303 A.2d 917, 919 (1973), cert. denied, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 219 (1973). Additionally, the nature of the reference and whether the remark was intentionally elicited by the Commonwealth are considerations relevant to the determination of whether a mistrial is required. Commonwealth v. Pursell, 508 Pa. 212, 230, 495 A.2d 183, 192 (1985); Commonwealth v. Williams, 470 Pa. 172, 178, 368 A.2d 249, 252 (1977).

Upon review of the exchange between the prosecutor and Mr. Middleton, this Court finds that the reference to Appellant's incarceration was not specifically elicited by

16

the Commonwealth. In addition, the line of questioning had nothing to do with Appellant's incarceration or criminal history. The record also indicates that, when the this Court was charging the jury, defense counsel was given the opportunity to request that the Court instruct the jury on any matters that had not already been covered, and counsel declined. (N.T., Sentencing at 283). This Court properly denied Appellant's Motion for a Mistrial.

SENTENCING

Finally, Appellant challenges the length of the sentence imposed by this Court as he contends it is excessive and unreasonable in light of his age, the victim's actions and that fact that the charges resulted from a single act. The law provides that a sentencing court is vested with broad discretion in imposing a sentence, and the court's judgment of sentence will not be disturbed on appeal absent a manifest abuse of that discretion. Commonwealth v. Dutter, 617 A.2d 330, 331 (Pa. Super. 1992) (citations omitted); Commonwealth v. Perry, 32 A.3d 232 (Pa. 2011). This standard of review recognizes that the sentencing court is in the best position to weigh the various factors involved in sentencing determinations, such as defendant's character, displays of remorse or indifference, and the nature and effect of the crimes. Commonwealth v. Canfield, 639 A.2d 46, 50 (Pa. Super. 1994). A trial court must follow the general principal that the sentence imposed is consistent with the need to protect the public, the gravity of the offenses as they relate to the impact on the life of the victims and on the community, and the rehabilitative needs of the defendant. 42 Pa.C.S. § 9721(b). When appealing the discretionary aspects of a sentence, a defendant must establish that there is a substantial question that the sentence imposed was improper under the sentencing

17

guidelines. Commonwealth v. Mouzon, 579 Pa. 419, 425, 812 A.2d 617, 621 (2002); 42 Pa.C.S. § 9781(b).

In this case, Appellant was convicted of a first degree felony, a second degree felony, a third degree felony, and second degree misdemeanor and a summary offense. This Court was permitted to impose an aggregate sentence, if set to run consecutively, of up to thirty-nine (39) years and three (3) months. See 18 Pa.C.S. §1103(1)-(3); §1104(2) and §1105. Additionally, as a "second strike" offender due to his prior conviction for a crime of violence, this Court was required to impose a mandatory minimum sentence of ten years on the aggravated assault charge. See 42 Pa.C.S. §9714. Although this Court had the option of running all sentences consecutively, Count 4 was set to run concurrent with Count 3 and no further penalty was imposed at Count 5. Commonwealth v. Hobson, 413 Pa. Super. 29, 37, 604 A.2d 717, 721 (1992)(internal citations and quotations omitted); (N.T., Sentencing at 12-14). Further, the 18 ½ to 37 years sentence falls within the legal parameters.

At the sentencing hearing, the victim provided a statement to be read into the record, a relative spoke on Appellant's behalf and Appellant chose not to speak. (N.T. Sentencing, 12/19/13 at 3-10). The trial court considered the comments along with argument by counsel. (Id. at 10). This Court also had the benefit of reviewing a Pre-sentence Investigation Report which, along with his a juvenile adjudication involving a firearm, revealed the fact that he was released on parole stemming from an armed robbery conviction shortly before the incident that lead to the instant conviction which involved an altercation with a firearm. (Id. at 11-12). Where the sentencing court had the benefit of a pre-sentence investigation report ("PSI"), we can assume the sentencing

18

court "was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." Com. v. Griffin, 2013 PA Super 70, 65 A.3d 932, 937 (Pa. Super. 2013) appeal denied, 621 Pa. 682, 76 A.3d 538 (2013) citing Commonwealth v. Devers, 519 Pa. 88, 101–02, 546 A.2d 12, 18 (1988).

To constitute an abuse of discretion, a sentence must either exceed the statutory limits or be patently excessive. Where the court is in possession of a pre-sentence report, the presumption will stand that the sentencing judge was both aware of and appropriately weighed all relevant information regarding a defendant's character along with mitigating statutory factors. Hobson, infra. This Court carefully considered all of the factors necessary to fashion an appropriate sentence in this case. In light of the nature of the crimes and Appellant's propensity for criminal violence, this Court properly exercised its discretion in fashioning an appropriate sentence based on the circumstances of the crimes for which Appellant was convicted.

Based on the foregoing, this Court finds that Appellant's judgment of sentence should stand.

RICHARD A. LEWIS, JUDGE

MEMORANDUM DATE:

Oct. 10, 2014

19